Anthony LANG, Sr. and Ahkeem Brown, individually and on behalf of all others similarly situated, Plaintiffs,

v.

PENNSYLVANIA HIGHER EDU-CATION ASSISTANCE AGEN-CY, et al., Defendants.

1:12-cv-1247

United States District Court, M.D. Pennsylvania.

Signed August 23, 2016

---

Derrek W. Cummings, James J. McCarthy, Jr., Larry A. Weisberg, McCarthy Weisberg Cummings, P.C., Harrisburg, PA, George A. Hanson, Stueve Siegel Hanson LLP, Kansas City, MO, for Plaintiffs.

Daniel B. Huyett, Stevens & Lee, Reading, PA, Jo Bennett, Schnader Harrison Segal & Lewis LLP, Kenneth D. Kleinman, Neil C. Schur, Stevens & Lee PC, Philadelphia, PA, for Defendants.

### MEMORANDUM & ORDER

John E. Jones III, United States District Judge

Pending before the Court is a motion for summary judgment filed by Defendant Pennsylvania Higher Education Assistance Agency, ("PHEAA"), (Doc. 133), and a motion for partial summary judgment filed by Plaintiffs Anthony Lang, Sr. and Ahkeem Brown, ("Plaintiffs"). (Doc. 139). For the reasons that follow, we shall grant Plaintiffs' motion to the extent it asserts issue preclusion on the basis of Fourth Circuit decisions finding that PHEAA does not qualify as an arm of the state. We shall deny PHEAA's motion to the extent it asserts Eleventh Amendment immunity based on its assertion it is an arm of Pennsylvania.

### I. PROCEDURAL HISTORY

The procedural history is abbreviated as it is summarized primarily for the benefit of the parties to the instant case.

On June 29, 2012, Lang filed a Complaint (Doc. 1), individually and on behalf of all others similarly situated, against PHEAA. In his Complaint, Lang alleged that he and other PHEAA employees were required to arrive at work early to log in to various computer applications and perform other tasks so that they would be ready to handle calls at the beginning of their shifts. Lang alleged that he, and others similarly situated, were not paid for this time. PHEAA's alleged failure to pay Lang and other employees for this time formed the factual basis for the two counts presented in Lang's Complaint. In Count I, Lang alleged a violation of the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. § 201 *et seq.* Count II of the Complaint alleged violations of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*, and the Pennsylvania Minimum Wage Act, 43 P.S. § 333.101 *et seq.*

On January 18, 2013, the Court granted PHEAA's motion to dismiss Count II and dismissed Lang's state law claims as stated in Count II of the Complaint. (Doc. 52). We held that Pennsylvania's Sovereign Immunity Act, 1 P.S. § 2310, shielded PHEAA from suit under the state laws at issue. Lang did not appeal this Order.

Anthony Lang and Ahkeem Brown, individually and on behalf of all others similarly situated, filed a First Amended Complaint on May 6, 2013. (Doc. 81). Count I continues to allege a violation of the FLSA by PHEAA. Count II alleges a violation of the FLSA by Defendant James L. Preston, in his capacity as President and CEO of PHEAA. Plaintiffs assert in Count III that all individual Defendants have violated the FLSA in their individual capacities. Counts IV through XIII claim violations of the FLSA by ten John Doe Defendants, in their individual capacities.

PHEAA then filed a motion to dismiss Plaintiffs' First Amended Complaint, arguing that the First Amended Complaint should be dismissed as to PHEAA because the Eleventh Amendment immunizes PHEAA from private suit under the FLSA. After applying the three-factor test for determining whether an entity is an "arm of the state" and thus immune from suit, *see Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989), this Court determined that the totality of the three factors weighed in favor of a finding that PHEAA is an arm of the state. We thus granted PHEAA's motion to dismiss Plaintiffs' First Amended Complaint. (Doc. 107).

Plaintiffs appealed this Court's grant of PHEAA's motion to dismiss to the Third Circuit.[1] The Third Circuit vacated our Order and remanded the case for further proceedings on the ground that the immunity issues were more properly resolved after further factual development. *Lang v. Pennsylvania Higher Educ. Assistance Agency*, 610 Fed.Appx. 158, 159 (3d Cir. 2015).

The parties subsequently completed discovery on the Eleventh Amendment arm of the state immunity question. (Doc. 129).

PHEAA filed a motion for summary judgment on February 13, 2016. (Doc. 133). Plaintiffs filed a motion for partial summary judgment on February 15, 2016. (Doc. 139). The motions have been fully briefed, and statements of undisputed material facts and answers thereto have been filed. These motions are thus ripe for our review.

## II. FACTUAL SUMMARY/BACKGROUND

With their motion for partial summary judgment, Plaintiffs argue in part that PHEAA should be precluded from relitigating its arm of the state status under the doctrine of issue preclusion because it has already had a full and fair opportunity to litigate that issue in the Fourth Circuit in *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646 (4th Cir. 2015) ("*Oberg III*") and *Pele v. Pa. Higher Educ. Assistance Agency*, 628 Fed.Appx. 870 (4th Cir.2015) ("*Pele*"). We shall begin with a summary of the undisputed facts bearing on Plaintiffs' motion.

During the discovery process, PHEAA has represented to this Court that it has provided Plaintiffs "with the entire 'arm of the state' discovery from the *Oberg v. PHEAA* and *Pele v. PHEAA* matters, produced in connection with proceedings before the Eastern District of Virginia, now on appeal in the Fourth Circuit." (Doc. 138, SOF ¶ 4). At multiple points during the discovery process, PHEAA referred Plaintiffs to PHEAA's previous production of documents from the *Oberg* and *Pele* cases. (*Id.*, ¶¶ 5-6).

Additionally, in its response to Plaintiff's Second Set of Interrogatories, among other discovery requests pertaining to its Eleventh Amendment defense, PHEAA in-

---

[1] More specifically, our holding was that PHEAA and one of the individual defendants in his official capacity were immune from suit under the Eleventh Amendment, and that all individual defendants were entitled to qualified immunity.

cluded and/or incorporated by reference a "Preliminary Statement" in which it recounted the documents it had already produced from the Fourth Circuit cases. (*Id.*, ¶ 6). The Preliminary Statement says in part:

> Indeed, PHEAA has filed detailed and comprehensive briefs in support of motions for summary judgment in both *Oberg v. PHEAA* and *Pele v. PHEAA*, which include detailed statements of undisputed material facts and responses (and in *Oberg v. PHEAA*, Oberg's statement of additional material facts and PHEAA's responses) that provide specific and precise citations to the discovery record (with exhibits) to support each fact. Similarly, PHEAA has fully briefed these very same issues as appellees in the Court of Appeals for the Fourth Circuit in *Oberg v. PHEAA*, 4th Cir. No.15–1093 and *Pele v. PHEAA*, 4th Cir. No. 14–2202, regarding the very same topics now at issue in this case. Like the briefs filed in the district court, PHEAA's appellate brief contains very specific citations to the discovery record for each relevant fact ... Those briefs, statements of undisputed facts, exhibits, and joint appendices provide unusually detailed sources of information to Plaintiffs that provide the very same information Plaintiffs now seek (and much more) with regard to both sides' legal positions and factual citations in support thereof.

(*Id.*, SOF ¶ 7, Ex. C at 2-3; Ex. D at 3). PHEAA admits that the Preliminary Statement contains substantially all of the quoted language, but argues that it is taken out of context. (Doc. 152, SOF ¶ 7).

In its response to Plaintiffs' Second Request for Production of Documents and Things, PHEAA detailed all of the documents it had produced in the *Oberg* and *Pele* cases, and then stated that as a result, "any further discovery is duplicative and unnecessary":

> Given the massive discovery already provided at substantial expense to PHEAA, Plaintiffs' requests for additional documents are not proportional to the needs of the case, as required by Federal Rule of Civil Procedure 26(b)(1). PHEAA addresses in turn each of the relevant considerations identified therein. First, the issues at stake in this case have been the subjects of previous exhaustive discovery in *Oberg v. PHEAA* and *Pele v. PHEAA*—all of which has been provided to or is accessible to Plaintiffs—and as a result, any further discovery is duplicative and unnecessary ... To the extent that discovery is needed regarding these issues, the discovery adduced in *Oberg v. PHEAA* and *Pele v. PHEAA* is more than sufficient to provide Plaintiffs with the necessary additional information and documents....

(Doc. 138, Ex. C, p. 4).

In its petition for rehearing en banc in *Oberg III*, PHEAA asserted that "[t]here is no material dispute about the relevant facts in this appeal." (Doc. 138, ¶ 14).

As one of its grounds for opposing issue preclusion, PHEAA argues that significant facts have changed since the Fourth Circuit issued its decisions in *Oberg III* and *Pele*. First, PHEAA points to recent legislation enacted by the Pennsylvania General Assembly in 2015 allegedly in response to the Fourth Circuit's decisions, and signed by the Commonwealth's Governor, that affirms the legislature's position that PHEAA "is an integral part and arm of the Commonwealth" and "is directly controlled by the Commonwealth." (Doc. 151, Ex. A; Doc. 134, SOF ¶ 3).[2]

Plaintiffs object to PHEAA's citation to this legislation because the legislative ac-

---

**2.** The relevant portion of the legislation reads in its entirety: "The appropriations set forth

tivity "occurred well after the 2009-2012 timeframe that PHEAA deems material to its arm-of-the-state status in this case." (Doc. 153, ¶ 3). Plaintiffs also assert that PHEAA's chairman was the "Prime Sponsor" of the legislation. (*Id.*, Ex. 18).

PHEAA also cites to the fact that the Pennsylvania Attorney General denied PHEAA's request for delegation of authority to handle its own legal representation and elected to represent PHEAA in *LaFrance Y. Chambers v. PHEAA*, No. 15–cv–0073. (Doc. 134, SOF ¶ 186). In *Chambers*, the Attorney General also asserted PHEAA's sovereign immunity. (Doc. 151, p. 16, citing to Answer, *Chambers v. PHEAA*, No. 15–0073, at 13 (M.D. Pa. May 8, 2015)).

Plaintiffs object to this evidence again on the grounds that this delegation denial occurred in March 2015, outside of the 2009-2012 timeframe that PHEAA has deemed pertinent to its arm-of-the-state defense. (Doc. 153, ¶ 186). Plaintiffs also note that this delegation denial occurred while PHEAA was litigating the arm-of-the-state issue in this case, as well as in *Oberg* and *Pele*. (*Id.*). Additionally, Plaintiffs cite to PHEAA's general counsel's prior testimony that he is not aware of any example where the attorney general has denied a delegation request. He also testified that PHEAA can override the denial of a delegation request. (*Id.*).

PHEAA also cites to the *Chambers* case as new evidence, postdating *Oberg III* and *Pele*, that the Commonwealth has settled litigation on behalf of PHEAA and paid money from non-PHEAA generated funds for the settlement. (Doc. 134, ¶ 227). Plaintiffs dispute this fact, arguing that neither PHEAA's general counsel's declaration nor the docket from *Chambers* contains any information showing that settlement funds came from the Commonwealth. Further, Plaintiffs again argue that the *Chambers* case was not even filed until January 2015 and it is thus outside of the relevant timeframe. Plaintiffs also counter the significance of the *Chambers* case on the settlement issue by pointing to "the rest of the record," which "shows that PHEAA has settled several multi-million dollar claims using its own funds." Finally, Plaintiffs cite to Pennsylvania law which it argues "expressly immunized" the Commonwealth from PHEAA's obligations, and thus to the extent the Commonwealth has funded such a settlement, it did so on a purely voluntary basis, which Plaintiffs argue is insufficient to establish the State Treasury factor, to be elaborated upon *infra*.[3]

PHEAA also cites to amicus briefs filed by the Treasurer of the Commonwealth of Pennsylvania and the leadership of the state's General Assembly with the United States Supreme Court with regard to PHEAA's petition for certiorari appealing the Fourth Circuit decisions in *Oberg III* and *Pele*. (Doc. 151, Exs. B & C). PHEAA asserts these briefs constitute new evidence that significantly modifies the facts

---

in this Act to the Pennsylvania Higher Education Assistance Agency, which is an integral part and arm of the Commonwealth and which is directly controlled by the Commonwealth, shall supplement other Commonwealth funds maintained by the Pennsylvania Higher Education Assistance Agency in order to fulfill its essential state governmental function of providing Commonwealth students with access to higher education opportunities and providing essential higher education pro-

grams for the benefit of Commonwealth students."

**3.** Clearly, much of Plaintiffs' argument with regard to the significance of *Chambers* is not so much a dispute of the facts of the case (other than their contention there is no evidence that the settlement funds came from the Commonwealth) but legal argument disputing the relevance and materiality of the Commonwealth's involvement in *Chambers*.

and circumstances of PHEAA that the Court may consider in deciding whether it qualifies as an arm of the Commonwealth. We will discuss the substance of these briefs in the Discussion portion of our Memorandum.

Also, because we shall hold that issue preclusion applies and thus that PHEAA is estopped from relitigating the issue of Eleventh Amendment immunity, we will not recite the factual positions of the parties with regard to the merits of that dispute.

### III. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir.2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial. *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir.2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.1982)). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir.2011) (quoting *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505) (internal quotation marks omitted).

### IV. DISCUSSION

As aforementioned, Plaintiffs argue that PHEAA should be precluded from relitigating its arm-of-the-state status under the doctrine of collateral estoppel/issue preclusion because PHEAA has already fully litigated this issue in the Fourth Circuit and lost in *Oberg III* [4] and *Pele.*

---

4. Indeed, the Fourth Circuit examined the arm-of-the-state issue in multiple appeals in *Oberg*. In *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency ("Oberg II")*, 745 F.3d 131 (4th Cir.2014), the Fourth Circuit reviewed the district court's finding, after applying the arm-of-the-state analysis, that the student loan corporations in question (including PHEAA) constituted state agencies not subject to suit and consequent granting of the corporations' motions to dismiss. The Fourth Circuit disagreed and found, upon review of the arm-of-the-state factors as applied

PHEAA responds that issue preclusion does not apply because the same issue is not in fact involved in the instant case and the Fourth Circuit cases, on the grounds that the Third Circuit and Fourth Circuit apply materially different standards for arm-of-the-state analysis and also because significant facts have changed since the Fourth Circuit issued its decisions in *Oberg* and *Pele*.

Plaintiffs additionally argue in their motion that even if the Court finds issue preclusion to not apply, that PHEAA has not met its burden to establish it is entitled to Eleventh Amendment sovereign immunity.

In PHEAA's motion for summary judgment, it argues that it is an arm of the Commonwealth of Pennsylvania entitled to sovereign immunity, based on the Third Circuit's three factor arm-of-the-state test set forth in *Fitchik*.

## A. Issue Preclusion/Collateral Estoppel

■ The Third Circuit applies the rule of collateral estoppel, or issue preclusion, as stated in the Restatement (Second) of Judgments: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *National R.R. Passenger Corp. v. Pa. Public Utility Comm'n*, 288 F.3d 519, 525 (3d Cir.2002) (quoting Restatement (Second) of Judgments § 27 (1980)). *National R.R.*

*Passenger Corp.* recited the elements of this rule as follows for issue preclusion to be appropriate: "(1) the issue sought to be precluded [is] the same as that involved in the prior action, (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." *Id.* (quoting *Burlington Northern Railroad Co. v. Hyundai Merchant Marine*, 63 F.3d 1227, 1231–2 (3d Cir.1995)(other internal citations omitted).

■ In the instant matter, collateral estoppel is being asserted by Plaintiffs, who were not a party to the Fourth Circuit cases in which PHEAA litigated the arm-of-the-state immunity issue. This is called offensive collateral estoppel, in that estoppel is being asserted " 'offensively' by a plaintiff seeking to estop a defendant from relitigating issues which the defendant has previously litigated and lost." *National R.R.*, 288 F.3d at 525 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 328, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)).

### 1. Whether the "Same Issue" is Involved

■ The main element in dispute between Plaintiffs and PHEAA is whether the first prong of issue preclusion has been met; that is, whether the issue sought to be precluded is the same as the one that was litigated in the Fourth Circuit in *Oberg III* and *Pele*.[5] PHEAA argues that the issue is not the same because the Third Circuit and Fourth Circuit apply materially different standards to deter-

---

to PHEAA, that Oberg had alleged sufficient facts that PHEAA was not an arm of the state. *Id.* at 140. The panel thus vacated that portion of the district court's judgment as to PHEAA and remanded to permit limited discovery on the question of whether PHEAA was "truly subject to sufficient state control to render [it] a part of the state." *Id.* at 140–41 (internal citation omitted).

5. *Pele* was a per curiam decision issued by the Fourth Circuit on the same day as it issued its decision in *Oberg III*. The Fourth Circuit comprehensively addressed and decided PHEAA's arm-of-the-state status only in *Oberg III*, although its holding in *Oberg III* effectively decided its disposition of *Pele*, as well.

mine an entity's arm-of-the-state status. Plaintiffs respond that the same issue is involved in both cases, which they characterize as whether PHEAA is an arm of the Commonwealth of Pennsylvania for purposes of Eleventh Amendment immunity. According to Plaintiffs, "minor variations" between the two multi-factor tests applied by the two circuits to determine arm status do not prevent the application of issue preclusion.

■■■ To resolve this dispute, we will commence by considering and comparing the two circuits' arm of the state multi-factor tests. The Third Circuit considers the following three factors:

(1) Whether the money that would pay the judgment would come from the state (this includes three of the *Urbano* factors—whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

(2) The status of the agency under state law (this includes four factors—how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and

(3) What degree of autonomy the agency has.

*Fitchik*, 873 F.2d at 659.[6] For some time, the Third Circuit's position on the weight of each of these factors in the analysis was that while "no single *Urbano* factor [was] dispositive, the most important [was] whether any judgment would be paid from the state treasury." *Id.* at 659. The Third Circuit no longer ascribes such primacy to that factor. *Stangl v. Port Authority of Allegheny County*, 181 Fed.Appx. 231, 232

n. 3 (3d Cir.2006) (quoting *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239 (3d Cir.2005)). The Third Circuit "now accord[s] equal consideration to all three prongs of the analysis—payment from the state treasury, status under state law, and autonomy." *See Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir.2006). Where it is a "close case," in that "indicators of immunity point in different directions," *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 47, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), the Supreme Court has advised that "the principal rationale behind the Eleventh Amendment— protection of the sovereignty of states through 'the prevention of federal-court judgments that must be paid out of a State's treasury,'—should 'remain our prime guide.'" *Febres*, 445 F.3d at 229.

The Fourth Circuit articulates its multi-factor test for assessing whether an entity is an arm of the state as follows:

(1) whether any judgment against the entity as defendant will be paid by the State . . .;

(2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;

(3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and

(4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

*Oberg III*, 804 F.3d at 650–51 (quoting *S.C. Dep't of Disabilities & Special Needs v.*

---

**6.** The *Fitchik* three-factor test is based on a nine-factor test from *Urbano v. Board of Man-* *agers of New Jersey State Prison*, 415 F.2d 247 (3d Cir.1969).

*Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir.2008)).

First, it is beyond dispute that, as Plaintiffs argue, the Fourth Circuit in *Oberg III* addressed and decided the issue of whether PHEAA is an arm of the state, which is of course the central issue in the instant matter, as well. The court in *Oberg III* stated, "[t]he only issue in this appeal is whether PHEAA qualifies as an 'arm of the state' or 'alter ego' of Pennsylvania such that it cannot be sued under the FCA." 804 F.3d at 650. After an extensive analysis under its multi-factor test, the Fourth Circuit held that PHEAA is not an arm of Pennsylvania, and reversed the district court's order granting summary judgment in favor of PHEAA. *Id.*

■ "To defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standard must be *substantial.*" *Raytech Corp. v. White*, 54 F.3d 187, 191 (3d Cir.1995) (emphasis added). As shown above, both circuits apply very similar multi-factor tests in deciding whether an entity is an arm of the state. Indeed, three of the Fourth Circuit's factors are nearly identical to the Third Circuit's three factors.

PHEAA makes much of the fact that the Fourth Circuit considered one additional factor in its arm-of-the-state analysis—whether the entity is involved with state concerns—but various decisions that are persuasive have noted that it is unnecessary for different courts applying similar standards to consider the exact same number of factors in order for issue preclusion to apply. For example, in *Georgia–Pacific Consumer Products LP v. Four–U–Packaging, Inc.*, a Sixth Circuit panel had to determine whether an Eighth Circuit ruling in a previous case barred the plaintiff's claims against the defendant in its trademark infringement litigation in the Sixth Circuit. 701 F.3d 1093, 1098 (6th Cir.2012). There, too, the plaintiff disputed only the first element of issue preclusion—whether the issues in the two cases were the same.

The Sixth Circuit panel noted that it resolved trademark infringement claims on the central issue of likelihood of confusion, and that it used an eight-factor test to decide that issue. *Id.* at 1100. It then noted that the Eighth Circuit considers only six factors when determining likelihood of confusion. Regardless, the Sixth Circuit panel found that it was ultimately inconsequential that the two circuits had a different number of factors because the substance of the tests was "largely identical," even though two of its circuit's factors were "unique" from those of the Eighth Circuit. *Id.* at 1101. The panel further noted that because it "weigh[ed] all the factors combined and no one factor alone [was] determinative," "no single factor trumps another" and thus the Eighth Circuit's omission of one of the Sixth Circuit's unique factors did not render the operative analysis so different that issue preclusion could not be applied. *Id.*

Clearly, then, a slightly different number of factors between two circuits' tests is not a dispositive bar to issue preclusion. To reiterate, the factors the two circuits use to determine arm-of-the-state status are largely the same. Further, both the circuits' standards weigh all the factors combined, and no single factor trumps the others. *See Oberg III*, 804 F.3d at 676; *Febres*, 445 F.3d at 229. Where the question of arm status is close after analyzing all the factors, both circuits' tests advise courts to keep in mind the purpose of the Eleventh Amendment, which is to protect state treasuries from federal court judgments. *See Febres*, 445 F.3d at 230; *Oberg III*, 804 F.3d at 676. Thus, we find the two circuits' tests on the arm-of-the-state issue to be largely the same so as not to bar issue preclusion on this ground.

Moreover, the Fourth Circuit found its additional factor—the state-concerns factor—to weigh slightly in favor of arm-of-the-state status for PHEAA; thus, if anything, the Fourth Circuit's standard was more favorable to PHEAA, and yet ultimately PHEAA still lost on the arm issue. *Oberg III*, 804 F.3d at 676.

PHEAA additionally argues that although the Third and Fourth Circuit tests both refer to the first factor as the "Treasury factor," the standards underlying this factor are substantially different in each circuit. PHEAA asserts that the Fourth Circuit's Treasury factor can be satisfied by establishing the state is "functionally liable," while the Third Circuit's Treasury factor focuses on potential legal liability. However, PHEAA mischaracterizes Fourth Circuit law. The Fourth Circuit in *Oberg III* clearly stated—multiple times—that it considers both legal and practical/functional liability with the Treasury factor. 804 F.3d at 651, 652. Further, the Fourth Circuit emphasized that the "focus" of the Treasury factor is whether the "primary legal liability for a judgment will fall on the state . . . ." *Id.* (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 428, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997)). This clearly aligns with the Third Circuit's Treasury factor, which considers both the state treasury's legal and practical/functional liability for judgments against an entity, *see Fitchik*, 873 F.2d at 659, with a parallel focus on legal liability. *See Febres*, 445 F.3d at 236 (". . . [W]e find that the practical or indirect financial effects of a judgment may enter a court's calculus, but rarely have significant bearing on a determination of an entity's status as an arm of the state. A state's legal liability (or lack thereof) for an entity's debts merits far greater weight . . . .").

PHEAA also contends that each circuit's arm-of-the-state test applies substantially different state law factors. PHEAA high-lights that the Third Circuit has articulated various sub-factors under the state law factor, which the Fourth Circuit has not specifically articulated as considerations, and thus PHEAA believes this further distinguishes the Third Circuit standard from the Fourth Circuit standard for Eleventh Amendment immunity. We disagree. As aforementioned, the Third Circuit formerly employed a nine-factor test when deciding arm-of-the-state status, *see Urbano*, 415 F.2d at 251, but in *Fitchik* provided a more concise three-factor standard. The Third Circuit in *Stangl* stated that the *Fitchik* standard is a "*synthesi[s] [of]* the factors to be considered when determining whether an entity is an arm of the state for Eleventh Amendment purposes." 181 Fed.Appx. at 232 (emphasis added). It is clear the Third Circuit inquiry is mainly focused on the three prongs in its Eleventh Amendment immunity analysis, with the sub-factor prongs as useful additional considerations under the three prongs but not elevated to the level of the three-factor standard itself. In other words, the sub-factors themselves are not the standard—the three factors are. Indeed, the sub-factors appear to be little more than specifications of areas of state law to consider, such as whether an entity is immune from state taxation, rather than wholly independent or unique considerations. In sum, both circuits' tests clearly require courts to examine all of a state's constitutional provisions, statutes, and regulations bearing on an entity in determining whether it qualifies as an arm of the state. PHEAA's argument on this point is little more than a purposeful mischaracterization of the Third Circuit's standards. As such, it is unavailing.

## 2. Whether the Other Elements of Issue Preclusion are Met

We now turn to the other elements of issue preclusion, noting as we do that not

only have they been met, but in addition PHEAA does not seriously challenge such a finding. Without a doubt, PHEAA's arm-of-the-state status was "actually litigated" in *Oberg*. Indeed, the issue went up and down the Fourth Circuit's federal courts multiple times. PHEAA characterized the discovery it produced on the issue in the Fourth Circuit litigation as "massive" and "exhaustive." (Doc. 138, SOF, ¶ 8). And as discussed in our Factual Summary, PHEAA in the instant matter has noted repeatedly that the "very same issue" was litigated in *Oberg* and *Pele*. Also, the central holding of *Oberg III*, after repeated appeals, was that PHEAA was not an arm of Pennsylvania, so there is no dispute that this issue was determined by a final and valid judgment. Lastly, for the same reasons, it is clear the determination of this issue was "essential" to the Fourth Circuit's judgment in *Oberg III* (and in *Pele*). *See Nat'l R.R.*, 288 F.3d at 527 (an issue is essential to a judgment if it is "critical" to the judgment rather than being "merely dicta"). The Fourth Circuit's determinations in *Oberg III* and *Pele* that PHEAA was not an arm of Pennsylvania was the sole basis for the vacation of the district courts' orders entering summary judgment in favor of PHEAA and remand for further proceedings on the merits of plaintiffs' claims against PHEAA in those cases.

### 3. Whether the Underlying Factual Situation has Materially Changed

 Even if the above elements are satisfied, "collateral estoppel is inappropriate if facts essential to the earlier litigated issue have changed." *Raytech Corp.*, 54 F.3d at 190 (citing *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). However, "[c]arried to its extreme, the concept of changed factual circumstances could totally undermine the application of collateral estoppel. Rare would be the case in which counsel

could not conjure up some factual element that had changed between adjudications." *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 846 (3d Cir.1974). Thus, the Third Circuit has advised that "where the changed circumstances are not material, and therefore do not amount to controlling facts, collateral estoppel remains applicable." *Id.*

 PHEAA argues that in the intervening time (indeed, less than a year) since the *Oberg III* and *Pele* decisions, the factual situation has changed materially. As discussed in the Factual Summary portion of our Memorandum, PHEAA cites to three main new "facts": 1) legislation enacted by the Pennsylvania General Assembly in late 2015 regarding PHEAA's status; 2) the Commonwealth's involvement in the unrelated litigation in *Chambers v. PHEAA*; and 3) amicus briefs filed by Pennsylvania state officials in connection with PHEAA's petition for certiorari in the United States Supreme Court. Plaintiffs respond that these three "so-called 'facts'" are not material, controlling facts that could preclude the application of collateral estoppel because they occurred outside the legally relevant time frame of the arm-of-the-state analysis in the instant matter.

We agree with Plaintiffs that throughout this litigation, PHEAA has steadfastly maintained that the material time frame is 2009 through 2012. (Doc. 138-2 (Ex. B), pg. 2; Doc. 138-4 (Ex. D)("PHEAA objects to the Notice to the extent it seeks testimony regarding facts that occurred before or after the relevant time period of June 29, 2009 through August 31, 2012, as irrelevant to any claim or defense.")). Therefore, based on PHEAA's legal position during discovery, any facts coming into existence in 2015 or 2016 would not be material to whether PHEAA was an arm of the state during the 2009-2012 time period. It is reasonable to infer that the *Fitchik* factors

are somewhat time-bound, in the sense that it is possible for an entity to become an arm of the state, when it earlier did not qualify, where state law has changed significantly or where the entity has become much less autonomous over time. We also note that PHEAA stated repeatedly throughout the discovery process in the instant matter that the "issues at stake in this case have been the subjects of exhaustive discovery" in *Oberg* and *Pele* and thus "any further discovery is duplicative and unnecessary." (Doc. 138-4, Ex. D, Prelim. Statement). As such, PHEAA cannot attempt to limit discovery in the instant matter to that completed in *Oberg* and *Pele*, and then argue at the summary judgment stage that "facts" occurring in 2015 and 2016 are controlling facts with regard to the arm of the state issue.

In any event, we do not find PHEAA's three asserted "facts" to be controlling regardless of the time frame issue. First, the new legislation enacted by the General Assembly is nothing more than a bald conclusory pronouncement. Just because the General Assembly passed legislation asserting that PHEAA is an "integral part and arm of the Commonwealth" and "is directly controlled by the Commonwealth" does not make it so. There is nothing talismanic here, and it remains for the courts to decide, based on arm-of-the-state legal analysis, whether an entity qualifies as an arm. Notably as well, the legislation did nothing to change the state laws governing the structure or specific rules governing PHEAA vis a vis its relationship to the Commonwealth.

Second, we do not find the Commonwealth's isolated involvement in a single case, *Chambers v. PHEAA*, to be a controlling fact that could upset the preclusive effect of the Fourth Circuit's exhaustive analysis of PHEAA's arm-of-the-state status in *Oberg III*. We also agree with Plaintiffs that it would be inequitable to permit PHEAA to rely on the *Chambers* case as a "new fact," when that litigation occurred while PHEAA was still litigating in *Oberg III* and thus could have raised this fact at that time. *See Latin American Music Co. Inc. v. Media Power Group, Inc.*, 705 F.3d 34, 42 (1st Cir.2013) ("Although 'changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues' ... a party cannot circumvent the doctrine's preclusive effect merely by presenting additional evidence that was available to it at the time of the first action.").

PHEAA also argues that that the Attorney General's assertion of PHEAA's sovereign immunity in PHEAA's Answer in *Chambers* is somehow a material, controlling new fact, in that it shows that the Commonwealth has "officially declared" the doctrine's applicability to PHEAA. However, again, it is not for the Commonwealth to decide whether an entity qualifies as an arm—it is a legal determination by a court, based on the relevant multifactor test. Further, the Attorney General's position in a particular case on PHEAA's arm status does not equate to official state law. Regardless, the Fourth Circuit already found the status-under-state-law factor to weigh in favor of arm-of-state status for PHEAA, and yet still held PHEAA to not be an arm of Pennsylvania, which provides further support that the Commonwealth's involvement in *Chambers* is not a controlling fact.

Additionally, as discussed earlier, PHEAA cites to *Chambers* as new evidence, postdating *Oberg III* and *Pele*, that the Commonwealth has settled litigation on behalf of PHEAA and paid money from non-PHEAA generated funds for the settlement. (Doc. 134, ¶ 227). First, the only evidence we have that the Commonwealth paid money from its funds (not generated by PHEAA) to settle *Chambers* is a Decla-

ration by PHEAA's Chief Legal and Compliance Officer Jason Swartley that this is so. (Doc. 133, Ex. 2, ¶ 73). More importantly, it is clear based on the record in *Oberg* that PHEAA has spent millions of dollars of its own funds settling claims and disputes. *See Oberg III*, 804 F.3d at 660–61. Thus, the Commonwealth's alleged settlement contribution in *Chambers*, in an undisclosed amount, does not amount to a controlling fact. Moreover, PHEAA does not argue that the Commonwealth was somehow legally liable to provide the settlement funds in *Chambers*, which could have possibly been a material fact under the Treasury factor. *See Lang v. Pa. Higher Educ. Assistance Agency*, 610 Fed. Appx. 158, 161 n. 5 (3d Cir.2015) ("As this Court has made clear, however, it is the legal obligation to satisfy the agency's debts that carries the most weight with respect to this first prong of the Eleventh Amendment analysis . . . .").

Lastly, we do not find the offered amicus briefs to upset the appropriateness of collateral estoppel. The briefs' arguments are based on the same state laws governing the structure of PHEAA and its legal relationship to the Commonwealth that the Fourth Circuit considered and which have not changed in the intervening months. Further, it is unclear why the state officials, or PHEAA, could not have made these same arguments during the Fourth Circuit litigation, and so to that extent, the "fact" of the amicus briefs is not "new" evidence which was unavailable at the time of the *Oberg* and *Pele* litigation.[7] The briefs do not represent changed facts so much as an attempt to challenge the findings and conclusions of the Fourth Circuit. For example, the Treasurer in his amicus brief challenged *Oberg III*'s finding that the Treasurer's requisition audit process is a "ministerial, checklist-focused approval process [that] does not substantively constrain PHEAA's fiscal discretion." *Oberg III*, 804 F.3d at 662. The Treasurer argued in his amicus brief that his oversight is in fact "both consequential and substantive" and further argued how he limits PHEAA's autonomy. (Doc. 151, Ex. C. at 8-9). The Treasurer wrote that the Fourth Circuit had "mischaracterized" his oversight role. However, these arguments are indeed more appropriate for an appeal of a decision rather than new factual evidence in another case that could circumvent issue preclusion. In other words, an argument that facts have been "mischaracterized" does not morph that argument into a new fact itself.

Additionally, the two amicus briefs address the possible practical effects of a substantial monetary judgment against PHEAA on the Commonwealth's financial condition, but the practical effect of judgments against PHEAA on the state treasury was comprehensively considered in *Oberg III* and is thus not a new factual issue. 804 F.3d at 657–661. And, as discussed previously, the state treasury's practical/functional liability inherently is not a "controlling fact" because the primary consideration of the Treasury factor is the legal, rather than functional, liability of the Commonwealth for a judgment against PHEAA. *See Lang*, 610 Fed.Appx. at 161 n. 5.

With all due respect to PHEAA, its proposed "changed factual circumstances" are exactly the kind of conjured-up "facts" that would undermine and frustrate the

---

7. Indeed, the Pennsylvania Treasurer, in explaining his interest in the petitions for writs of certiorari in *Oberg III* and *Pele*, noted that the "Treasury Department's Chief Counsel provided a Declaration that is part of the trial record in this matter." (Doc. 151, Ex. C, p. 2 n.2). Thus, the Treasury's position on PHEAA's arm of the state status was indeed considered in the Fourth Circuit litigations.

purposes of the doctrine of issue preclusion were this Court to find that they prevented application of preclusion.

### 4. Equitable Considerations

 "[I]n cases involving the offensive use of collateral estoppel, the Supreme Court has instructed that courts must take special care to ensure that its application does not work unfairness to party against whom estoppel is asserted." *Raytech Corp.*, 54 F.3d at 190. Offensive collateral estoppel is unfair to a defendant where "the defendant may have been sued in the first action for 'small or nominal damages' for which 'he may have [had] little incentive to defend vigorously, particularly if future suits [were] not foreseeable[.]'" *Burlington Northern R. Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1232 n. 7 (3d Cir.1995) (internal citations omitted). Application of offensive collateral estoppel is also unfair where the "judgment relied upon for a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant" or where the second action offers procedural opportunities that were not available to the defendant in the first action that could lead to a materially different outcome. *Id.* (internal citations omitted).

 We see no unfairness in applying estoppel against PHEAA. It is clear that PHEAA litigated the arm-of-the-state issue "vigorously" in the *Oberg* litigation—indeed, it had even more incentive to litigate the issue there, in that "the amount in controversy in [*Lang v. PHEAA*] is a very small fraction of the amount in controversy in *Oberg v. PHEAA* ...." (Doc. 138, SOF ¶ 8).

Additionally, there is no evidence of judgments in other circuits inconsistent with the Fourth Circuit's judgments in *Oberg III* and *Pele*, nor is there evidence that PHEAA has procedural opportunities in the instant matter that it did not have available to it in the Fourth Circuit.

Accordingly, having found that all the requirements of issue preclusion have been met, we shall grant Plaintiffs' motion for partial summary judgment in the instant matter.

## IV. CONCLUSION

Ultimately, we conclude that this field has already been plowed multiple times by the Fourth Circuit, and we thus will appropriately deny PHEAA's invitation for us to do so again. PHEAA is seeking a proverbial second (indeed, third) bite at the apple in the instant matter, when it is clear that the exact same issue—whether it is an arm of the state of Pennsylvania—has been quite exhaustively litigated in the Fourth Circuit. Indeed, the Fourth Circuit litigation concluded less than a year ago. We do not see a need to further exhaust federal court resources by permitting PHEAA to litigate this issue again in the Middle District of Pennsylvania.

Accordingly, for all the reasons detailed hereinabove, we shall grant Plaintiffs' motion for partial summary judgment and deny PHEAA's motion for summary judgment.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' motion for partial summary judgment, (Doc. 139), is **GRANTED** to the extent that they seek to preclude PHEAA from relitigating whether it is an arm of the state of Pennsylvania.

2. PHEAA's motion for summary judgment, (Doc. 133), is **DENIED** to the extent it seeks judgment in its favor on the ground that it is an arm of the state of Pennsylvania and thus entitled to sovereign immunity pursuant

to the Eleventh Amendment to the United States Constitution.

3. Within thirty (30) days of today's date, counsel for the parties **SHALL FILE** a stipulated agreement as to the remaining case management deadlines, consistent with this Court's calendar provided herein.

Attachment

**Judge Jones**
**2017 Court Calendar**
**(Revised 8/12/16 date changes \*)**

| Trial List | Discovery Cut-off | Dispositive Motions Cut-off | Final Pre-Trial Conferences | Jury Selection |
|---|---|---|---|---|
| January | 7/29/16 | 9/1/16 | 12/1/16 | 1/10/17* |
| February | 8/30/16 | 10/3/16 | 1/9/17* | 2/2/17 |
| March | 9/30/16 | 11/1/16 | 2/1/17 | 3/2/17 |
| April | 10/31/16 | 12/1/16 | 3/1/17 | 4/10/17* |
| May | 11/30/16 | 1/3/17 | 4/3/17 | 5/2/17 |
| June | 12/30/16 | 2/1/17 | 5/1/17 | 6/2/17 |
| July | 1/31/17 | 3/1/17 | 6/1/17 | 7/6/17 |
| August | 2/28/17 | 4/3/17 | 7/5/17 | 8/2/17 |
| September | 3/31/17 | 5/1/17 | 8/1/17 | 9/5/17 |
| October | 4/28/17 | 6/1/17 | 9/1/17 | 10/10/17 |
| November | 5/31/17 | 7/3/17 | 10/2/17 | 11/2/17 |
| December | 6/30/17 | 8/1/17 | 11/1/17 | 12/4/17 |

**Case Management Conferences:**
1/31/17
2/28/17
3/31/17
4/28/17
5/31/17
6/30/17
7/31/17
8/30/17
9/29/17
10/31/17
11/29/17
12/29/17

**Judge Jones**
**2018 Court Calendar**

| Trial List | Discovery Cut-off | Dispositive Motions Cut-off | Final Pre-Trial Conferences | Jury Selection |
|---|---|---|---|---|
| January | 7/28/17 | 9/1/17 | 12/1/17 | 1/4/18 |
| February | 8/30/17 | 10/2/17 | 1/3/18 | 2/2/18 |
| March | 9/29/17 | 11/1/17 | 2/1/18 | 3/5/18 |
| April | 10/31/17 | 12/1/17 | 3/1/18 | 4/3/18 |
| May | 11/30/17 | 1/2/18 | 4/2/18 | 5/2/18 |
| June | 12/29/17 | 2/1/18 | 5/1/18 | 6/4/18 |
| July | 1/31/18 | 3/1/18 | 6/1/18 | 7/5/18 |
| August | 2/28/18 | 4/2/18 | 7/2/18 | 8/2/18 |
| September | 3/30/18 | 5/1/18 | 8/1/18 | 9/5/18 |
| October | 4/30/18 | 6/1/18 | 9/4/18 | 10/2/18 |
| November | 5/31/18 | 7/2/18 | 10/1/18 | 11/5/18 |
| December | 6/28/18 | 8/1/18 | 11/1/18 | 12/4/18 |

**Case Management Conferences:**
1/31/18
2/28/18
3/30/18
4/30/18
5/30/18
6/29/18
7/31/18
8/29/18
9/28/18
10/31/18
11/30/18
12/28/18